**A. S. WIKSTROM, Inc., as owner of THE A. S. WIKSTROM, Libellant,**

v.

**MORANIA OIL TANKER CORP., as chartered owner of THE BILL ENDTER and THE MORANIA 130, Respondent.**

**4933–Civil.**

United States District Court
N. D. New York.
June 22, 1954.

Bond, Schoeneck & King, Syracuse, N. Y., George Bond, Syracuse, N. Y., of counsel, for libellant.

Higgins, Kelsen, O'Hara & Young, Syracuse, N. Y., John A. Lyon, New York City, of counsel, for respondent.

BRENNAN, District Judge.

### Findings of Fact

1. On October 29, 1952, about 5:45 P.M. a collision occurred between the scow or barge A. S. Wikstrom and the barge Morania 130, powered by the tug Bill Endter on the New York State Barge Canal, at a point known as the Weedsport Terminal. This court has jurisdiction over the parties and the controversy arising out of such collision.

2. The libellant, a domestic corporation, was at all times here pertinent the owner of the scow A. S. Wikstrom.

3. The claimant-respondent, a domestic corporation, was at all times here pertinent the owner of the tug Bill Endter and the barge Morania 130.

4. The barge A. S. Wikstrom was 70 feet long, with 40 foot beam and 6 feet in depth. On the occasion involved herein she was drawing 1½ feet forward and aft. She was composed of five sections, each section, except the middle, being made up of ten air-filled steel tanks, each fastened to the adjoining section by welded angle irons and sixteen ¾ inch bolts. The middle section was constructed with its two aft tanks missing where a propulsion unit was to be installed.

5. The tug, Bill Endter, was 83.3 feet long with a 23.7 foot beam and 9.9 foot depth. On the occasion involved herein her draft was such that the helmsman in the pilot house of the Bill Endter was from fifteen to sixteen feet above the water line.

6. The Morania 130 was 229 feet, four inches in length, with 42.9 beam and 14.5 depth. On the occasion involved herein, she was drawing 6½ to 7½ feet forward and aft.

7. At the time of the collision the A. S. Wikstrom was moored to the dock wall of the Weedsport Terminal on the starboard side of the New York State barge canal. She was fastened to the dock by 9/16th inch steel cables secured forward and aft on the A. S. Wikstrom and secured to stanchions on the dock. She also was tied fast to the dock stanchions by one inch and one and one-half inch lines.

8. The navigable channel of the New York State barge canal in the area opposite and adjacent to the Weedsport Terminal is 163 feet wide. The distance from the first bend in the canal to the west of the Weedsport Terminal to the said Weedsport Terminal is approximately 700 feet.

9. The weather was clear; darkness had set in; the current was flowing East, that is, towards the starboard bank of the Canal.

10. The A. S. Wikstrom was carrying lights forward and aft, which lights weighing 38 pounds each, were placed on a flat surface on the deck of the A. S. Wikstrom on the outboard or port side. These lights were supplied to the libellant by the Department of Public Works, State of New York, and had been cleaned and filled on the morning of October 29, 1952. They were visible for at least one mile. A similar light was also placed on the west end of the terminal wall on the outboard side. At the time of the occasion involved herein, these lights were lighted and visible to the East bound canal traffic.

11. The tug Bill Endter on the occasion involved herein was pushing the Morania 130, Easterly on the New York State barge canal and prior to 5:45 P.M., on October 29, 1952, was approaching the Weedsport Terminal. The second mate was at the wheel and a deck hand was also in the wheel house, which movable wheel house was in a lowered position. There was no lookout stationed at any place on the float other than in the wheel house.

12. The tug Bill Endter and the Morania 130, heading East rounded the bend in the barge canal immediately West of

the Weedsport Terminal, navigating on the starboard side of the channel. After rounding the bend, the tug Bill Endter pushing the Morania 130, navigated in such a manner so as not to pass the A. S. Wikstrom without striking her, although the channel was sufficiently wide to permit passage without collision. The A. S. Wikstrom was not observed by any member of the crew of the Bill Endter and Morania 130 until within one hundred feet thereof.

13. The tug Bill Endter and the Morania 130 proceeded on their course without heaving to and lending assistance to the stricken A. S. Wikstrom.

14. That as a result of the collision the A. S. Wikstrom sustained substantial damage.

## Conclusions of Law

1. This court has jurisdiction of the parties and subject matter.

2. The A. S. Wikstrom was properly moored, lighted and free from fault on the occasion of the collision found above.

3. The proximate causes of the collision and consequent damage to the A. S. Wikstrom were the negligent navigation on the part of the tug Bill Endter and the Morania 130; the failure of those in charge of the Bill Endter and Morania 130 to observe the lights abroad the A. S. Wikstrom; the failure of the Bill Endter and Morania 130 to post a proper lookout.

4. An interlocutory decree may accordingly be entered in favor of the libellant.

## Discussion

■■ The collision which is the crux of this litigation appears to have no valid reasons for its occurrence. The barge or scow was moored at a point at the Weedsport Terminal where vessels were occasionally moored. There is no doubt that the bend in the channel west of the terminal, taken together with the flow of the current, created a tendency for east bound vessels to move towards the terminal wall where the Wikstrom was moored. This situation required navigation on the part of the respondent with care in accordance with the danger to be apprehended. The moored barge occupied about 40 feet of the channel, the total width at that point being about 163 feet. Passage should have been made without contact.

The respondent's contention that the Wikstrom was not properly moored, and that its east end was angling away from the wall and into the channel, is not borne out by the evidence or the physical facts. Wire cables and ropes were shown by positive evidence to have secured the craft to the terminal wall. At least one of the exhibits show the shredding of one of the cables which substantiates libellant's claim that the barge was torn from its mooring by the force of a collision rather than that it was loosened by the wake of a passing yacht. The remaining contention that the moored craft was without lights depends entirely upon the testimony of the crew members, whose testimony might be considered as negative in nature. They did not see lights upon the object with which they collided. Some members of the crew did not even see the light on the terminal wall which was not involved or affected by the accident. There can be no doubt as to the fact that a light was placed on the moored barge at both its fore and aft outboard side. These lights were visible easterly to a point where the bend in the channel first permitted their observance from an east bound vessel. Disinterested testimony shows that they were lighted about ten minutes before the collision. There is no reasonable premise from which an inference could be drawn that they failed during that ten minute period prior to the collision. The inference is to the contrary. The confined waters of the canal do not become rough under ordinary circumstances, and there is no credible evidence which would support an inference that the lights had failed for any reason prior to the collision.

The physical effects upon the moored barge show plainly that it was struck by a heavy blow. The outboard welded

sections were torn apart and at least one section piled on top of the inboard sections next to the terminal wall. It taxes credulity to conclude that such a condition was caused other than in the manner claimed by the libellant. The decision may be considered as primarily factual, and the Court has no difficulty in determining that the libellant was free from fault, and that the respondent was entirely at fault.

The principles of law involved in the decision of this controversy requires but brief discussion.

■ The principle of admiralty to the effect that, in a collision between a moving vehicle and a vessel moored, the burden is upon the moving vessel to show that she was without fault, is applicable. This principle was recognized in our Circuit in The Waterford, 6 F.2d 980, and elaborated in Carr v. Hermosa Amusement Corp., 9 Cir., 137 F.2d 983. See also The Vulcan, D.C., 60 F.Supp. 158. So there is imposed here a burden of explanation upon the respondent as to the happening of the accident and the cause therefor. The respondent's brief as to the angling of the moored vessel from the terminal wall into the channel is rejected as a matter of fact; the evidence being insufficient to support it. There remains then the contention of respondent that the moored vessel carried no lights.

The respondent cites cases to the effect and urges that, since there is no testimony as to the existence of the lights on the moored scow for about ten minutes prior to the collision, a finding that such lights were properly placed and lighted at the time of the collision is contrary to legal precedents. To pursue respondent's contention, it amounts to urging that the existence of lights is dependent upon a positive observation at the moment of the collision. The Court's conclusion, after an examination of the cited cases, is to the effect that the question of the existence or non-existence of lights at the time of the accident is one to be decided upon the particular facts

of each case. It appears to be correct that some of the older cases lend some measure of support to respondent's position. It can not be overlooked, however, that the modern type and efficiency of lights used for mooring purposes are not susceptible to failure, as were those under discussion in the earlier cases. Here, we can rely upon disinterested witnesses as to the condition, location and efficiency of the lights up to about ten minutes prior to the collision. Then, we are met with evidence by the crewmen of respondent to the effect that they saw no lights on the object with which they collided. The value of such evidence, negative in character, is discussed in The Elwood, D.C., 69 F.Supp. 368, and in The Richmond, D.C., 114 F. 208. In the case of The Bright, 4 Cir., 124 F.2d 45, the court indicated that the question of the existence of lights at the time of the collision was a matter of determination from the preponderance of the testimony, and it is perhaps sufficient to say that the two lights were lighted upon the moored vessel, as claimed by the libellant, is established by the preponderance of evidence here.

The case of The Bright, supra, is also an answer to respondent's lightly urged contention that the Wikstrom was moored at an unusual place.

■ It seems to be conceded that the lights as placed upon the Wikstrom complied with the rules and regulations of the New York State Barge Canal, but respondent urges that the provisions of the Coast Guard Regulations, 33 C.F.R. § 80.16, are applicable. It is urged that such regulations require that the lights be placed at least eight feet above the water surface. The lights here were concededly about four and one-half feet above the water. A short answer to this contention is that the Court is of the opinion that the Coast Guard regulations do not apply, since they refer to vessels when being towed. In any event, it is rather difficult to conclude that the height of the lights above the water had any causal connection with the collision,

since no lights were observed on the moored vessel. To say that one would observe a light eight feet above the water when lights four and one-half feet above the water remained undetected is speculative.